Good morning, Your Honors. Mark Teerbeek for the Plaintiffs and Appellants, Pamela McDonald and Connie Coleman. Mr. Teerbeek, if I may, I would like to reserve two minutes. If you do so, just watch the clock. Thank you. This is one of those cases that involves that ever-elusive, fine analysis of the three-step burden-shifting analysis in summary judgment. And as we see Well, why don't we go right to qualified. What is the showing that the actual sale to the other buyer matches the offer that your client made here? What is the showing that the actual sale to the ultimate buyer matches the offer? Well, you can answer any way you want, but what's your showing on qualified? Thank you. The showing on qualified was that she had been, we have evidence, not stricken or ruled out inadmissible that she had obtained a preapproval for $180,000, which is more than enough to purchase the property. That in and of itself, this being summary judgment, raises the inference that she was qualified. What was the listed this house was listed on the MLS? Yes. What was the listing price, asking price? I believe it was about $142,000. 142, even? I don't have that exact figure. And the offer that McDonald through Coleman made was for a total of what? $142,000.  $142,000. $142,000. Oh. A total of $153,890. So the offer was above the asking price. That's correct, Your Honors. And how much of that $153,000 involved a carryback? $15,389. That's a credit of $4,500 for the closing costs? That's correct, from the carryback. And what did the House ultimately sell for? I believe it sold for $139,000. I will be checking that out in the record right now. $139,000 even? I'm sorry, $138,000 even. $138,000. That's correct. And how long after the rejection or withdrawal of the McDonald offer was that sale consummated? Approximately three days. Three days. Less than a week. Okay. Thank you. Go ahead. And you said that she was prequalified for up to $180,000? $180,000, yes. Is that in the record? That is. The district court indicates in its opinion that there was some question about that because the evidence offered was a letter from the plaintiff, McDonald, rather than a bank or other financing institution. Is that inaccurate? Excuse me? Is that inaccurate? That's not inaccurate as to what the trial court did, and that's where it erred. But that was a credibility and weighing determination that is impermissible on summary judgment. No, no. My question is, was the letter authored by the plaintiff rather than a financial institution? Is the district court factually incorrect there? Yes. One of the plaintiffs, the broker, Connie Coleman, authored that letter. So is it correct that it's not from a bank? That's correct. It was not from a bank. And can I go back just to the numbers again? You're saying that her offer was 153,890 minus 10 percent and 4,500. So does that mean, then, that the net offer was about 133, more or less, thereabout, somewhere in there? I believe so, yes. Okay. How can you say that's net? Excuse me? How can you say that's net? It may be the net amount at closing, but it's not the net offer, is it? Well, the net at closing, whatever the ---- I understand there's two components. She was saying, I will pay $153,000 plus, and the way I propose in this offer to do it is to pay 15,000 will be a carryback from the owner, and there are some closing costs, and the rest will come out of that pre-approved financing from my bank. Is that essentially it? That's essentially it, yes. There would be a component of money that would go to the seller directly at close, plus there would be a note carrying back. The problem, though, is, in all of this, is that this was an initial offer. She was qualified. We have evidence that shows that she was qualified that was not objected to or ruled inadmissible. Wherever it came from, whatever its source, it was in the record. It raised the inference, sufficient for a tribal issue, that she was qualified, and it was an initial offer. She didn't have to prove that she would have ultimately got the place. She simply has to establish for purposes of summary judgment that she was qualified and that this offer never got past base one because of the conduct of the defendants. She had no opportunity to counter. She had no opportunity. It's the opportunity that was lost that is the possibly damage. Well, what are we to do with the seller's requirement that it be in all cash? That was never disclosed in the MLS listing, and the seller indicated that deposition that he considered it a strong offer and may well have taken it because, ultimately, at the end of the day, it gave him more money. Okay. Well, what, from the plaintiff's point of view, happened in the time sequence? And the offer that we discussed was made, and it was communicated from Coleman, the buyer's agent, to Gallagher at First Shasta Cowell Banker. Is that right? It was never communicated by First Shasta to other than verbally and then in a mischaracterized manner. Okay. McDonnell authorized the offer being made. Yes. Did she give that authorization to Coleman? Yes. And then Coleman relayed the offer to whom? I'm not talking about orally written. How did it get from Coleman to eventually to the seller's agent? She initially provided it to the defendants, Mattioli and Gallagher, in writing. Okay. They verbally characterized it, I would say mischaracterized it, to the seller's agent, who then relayed that mischaracterization to the seller itself. And what was the mischaracterization? The mischaracterization was that, according to the seller's agent, he had believed that the $15,000 carryback was against the sales price as opposed to in addition to it. Was that mischaracterization intentional or simply a mistake? That's a question of fact for the jury, based on the other evidence that we have. What's your position? My position, it was intentional. Okay. They so mischaracterized or not, Gallagher and Mattioli at First Shasta, Colwell Banker, provide the offer to Woodville? Do I have that right? They verbally did it, but then withdrew the offer and then wrote rejected. I'm just trying to track this simply. Sure. Help me with that. And we're using up a lot of your time. It goes from the people at First Shasta, Colwell Banker in Redding to Woodville and then to Moore the seller, right? Verbally, yes. Okay. Okay. That's how it gets there, right? Yes. Yes. Yes. Okay. And it's was it rejected? The seller's, excuse me, the buyer's agent. I don't care whether it was mischaracterized or how it got there. It was withdrawn. Was the offer rejected? It was withdrawn. Okay. It was withdrawn by Gallagher. By Gallagher. By Mattioli and Gallagher, yes. With McDonald's permission? No. Was McDonald ever given an opportunity to counter? Never. Okay. Counsel, your time has expired, but we took our questions took you past your time, so I'll allow you a minute on rebuttal. Thank you. We'll hear from the real estate companies. Colwell. Good morning, Your Honor. Good morning. My name is Carla Menard. I represent defendants and respondents for Shasta Realty, Thomas Gallagher and Richard Mattioli in this case. Co-defense counsel John Schwimmer appears today on behalf of Respondent and Defendant Colwell Banker Realty. How do you want to allocate your time? If it please the Court, we would like 8 minutes, and on behalf of Mr. Schwimmer would reserve 2 for him. All right. Very good. I thought I heard the Court, as I was preparing to come up, ask to hear from Mr. Schwimmer first. Is that correct? No. No, no. Okay. It's your call. Your 10 minutes, which is now 9 and 22. Yes. I'll speak quickly. First, I'd like to address preliminarily some of the points raised by Mr. Terbeek and some of the questions raised by the panel. Specifically, Your Honor, Judge O'Scanlan, you raised a question at the beginning with regard to the term qualified. And I think there's an important distinction between qualified in the sense that Mr. Terbeek is talking about it, which might mean financially able, and qualified in terms of able to purchase this piece of property. I don't think qualified means the same thing as they financially can do it. Did Moore, did Moore, the seller, testify that if he had understood at the end of the day he was receiving $153,000 for his house, he would have accepted it? If he were receiving above the asking price, but that was not his testimony. Yes. Whether it was or not, he said that. Yes. Yes, he did. Let me ask you this question. If the McDonald offer had been accepted and the transaction had closed, Colwell Banker would be entitled to a commission, correct? Yes. How much? What percentage? I believe it was a percent and a half, percent and a half. And that would have been figured against the offer price of 153,890, correct? Yes, Your Honor. You wouldn't have deducted the closing cost or the carryback to determine the amount of Colwell Banker's commission? That's right. I think that's accurate. Okay. What does the record tell us why the defendants withdrew the McDonald offer? I'll speak to that. With regard to whether or not you asked Judge Hawkins very pointed questions about whether or not the offer was actually communicated, the facts are that Ms. Coleman herself transmitted the exact offer, Mrs. McDonald's offer, unchanged in any way, to the seller's agent, Mr. Woodfield, that evening, as soon as she got back to the Bay Area, in fact. So at midnight that evening, 3 days prior to even receiving the Donahue offer, they had that offer in hand. The seller, who are not defendants in this case, and seller's agent, together decided, and the evidence in the record and the deposition is very clear, they rejected that offer. And the reason we have is Mr. Moore saying repeatedly in his deposition that the reason he rejected the offer is because he wasn't willing to carry paper. He didn't want to have to undertake every all of the risk that's associated with the carryback. Sotomayor, does that square with his testimony that if he had, even with the carryback, he had gotten above his asking price, he would have accepted? It squares. And this is why I think in our papers I did something that was almost unheard of in terms of attaching six, actually incorporating six or eight pages of deposition testimony. Mr. Moore's testimony can't be sort of pulled out if you read it in context. It isn't the testimony. The McDonald offer is not the offer he was being asked about. Now, with regard to this closing cost issue and where those, those, where that deduction is made, for the first time in Appellant's reply brief, it was acknowledged that it's not an issue of whether or not buyer or seller got credit for the closing cost. It was now an issue of where they came out of the chain financially. And with regard to that, the evidence contradicts what their position is now, which is the $4,500 would have come out of after the carryback. The offer itself, if I believe it's Appellant's excerpt of record, tab number 74, the sub-tab 16, the offer itself, where it provides for additional financing terms, says seller to carry 10 percent of sales price, period. New sentence. Seller to credit $4,500 toward nonrecurring costs. And in the line to the right where the figures are actually written out, the carryback of 10 percent is identified as $15,389. It's not identified as $10,889, which is the position that Appellants are now taking. Did either Moore or Woodfill communicate to Gallagher or Mottoli that the seller was unwilling to carry back? Did either Woodfill or Moore communicate to Mr. Gallagher that McDonald was unwilling or that Moore was unwilling to? Yes. Oh, absolutely. In fact, there was a telephone conversation. The agent, on the way, as Ms. Coleman and Ms. McDonald were on the way home, called and said he's not willing to carry paper. I'm paraphrasing, but you know. Wouldn't the ordinary way that would be handled would be for the buyer's agent to return to the buyer and say, they're unwilling to carry back, would you like to make a new offer? It could be. Or for the seller to counter and say, I'll accept 153 or 150, but no carryback, something like that. It certainly could be, Your Honor. That's not atypical. Why didn't that happen here? It didn't happen because for the same reason, if a mediation breaks down when you're $6 million apart, as opposed to, you know, the shorter strokes. In this case, Mr. Moore said unequivocally, I didn't want to carry paper. And there was a very significant issue on behalf of both himself and his agent. How can we reconcile on summary judgment the apparent conflict between more the seller's statement that now that he understands the McDonald offer, he would have taken it, and the fact that he didn't want to carry back? How do we resolve that? Because he wasn't being asked about the McDonald offer. And it wasn't he was that's why I say the deposition testimony on that issue is so critical. The evidence is that he not only was unwilling to carry paper, but that both he and his agent, the deal was a nonstarter to begin with, which is why when it was being communicated, his agent cut Mr. Gallagher off and said, it's not a go. My guy is not willing to carry paper. And in addition, we're listed at the high end of the market. Okay. When that happened, did Gallagher go back to Coleman and McDonald and say, no paper, what do you want to do now? Yes. In fact, that did happen. There was a conversation on the way home. And Ms. Coleman became frustrated, and the testimony is that that conversation did not end well. At that point, Mr. Gallagher then went to his broker, keeping in mind Mr. Gallagher wants to make the commission on the deal, goes to his broker and says, hey, can you talk to them and see, you know, maybe there's something else we can do to try to keep the deal alive. There's testimony that, you know, that was everyone's intent. To get back to Your Honor's first question about whether or not it was customary, the uncontradicted evidence in the record is from the broker, from the nonparty seller, broker's agent, Mr. Woodfill said, it's done all the time. We get we hear the terms of the offer, and then we don't fax it over because we know it's a nonstarter. Martin, Marvin Silverman, the expert, declared the same thing, that it's absolutely typical. There's nothing sort of nefarious or smoke and mirrors about it, that that's customarily done. So with regard to the 40 ---- I've asked you some questions that have taken into your co-counsel's time. I just wanted to alert you. We see bigger numbers here than you do, larger in size. Okay. Well, if the ---- Let me just ask you, I'll give an extra minute there. Let me ask you, what is your position with respect to the issue of, quote, qualified, unquote? I think qualified, as the lower court found, means that they, the buyer is willing to purchase on the terms that are demanded by the seller. If they want them to come to the signing in a purple jacket, or whatever the term is, if it's not carrying paper. But qualified means that they're willing to do what the buyer demands in order to close the deal. And the evidence here is that they weren't. Again, I think qualified is not financially able, and that's the end of the analysis. One more issue with regard to the $4,500. If the Court looks at exhibits of record, excerpts of record, rather, 75, the two subsequent offers allegedly made by Ms. McDonald on other properties on August 17th, it is very telling how the 10 percent carryback and the credit for nonrecurring closing costs is referred to in both of those documents. And it suggests very strongly that the contemplation was the 10 percent would come out of the sales price. Judge Hawkins, you asked a question about whether or not the letter was from a bank. The preapproval, I think, as the panel knows, is different from a loan commitment, and there's no evidence that there was a loan commitment. Roberts. Thank you, counsel. Now, your time has fully expired, but I will allow Mr. Schwimmer to have one minute if he would focus on his specific argument. Thank you. May it please the Court. I represent a different defendant. Introduce yourself for the record, please. Oh, I'm sorry. My name is John Schwimmer from Sussman Shank, and I represent Defendant and Appellee of the Colwell Banker Real Estate Corporation. My client is in a completely different position in this litigation than Ms. Menard's client. My client is the franchisor. It is undisputed that my client had no involvement whatsoever in any of the underlying events that are the subject of this litigation. If this Court finds that the summary judgment ruling correct was correct below, then there's nothing further to decide with respect to my client. But if this Court determines that the grant of summary judgment should be reversed, there is an independent ground for summary judgment in favor of my client, which is that there's no basis for holding my client derivatively or vicariously liable for any alleged misconduct of its franchisee. That issue is dealt in detail in our papers. The only theory that was asserted up until the time we filed our motion for summary judgment was that Ms. McDonald had no knowledge of her client's identity. We submitted evidence that demonstrated that my client had no control over the day-to-day business of the company, which is to test under the Syslaw decision. The plaintiffs then, for the first time in opposition to summary judgment, raised an entirely new theory of agency, which was this issue of apparent agency or ostensible authority. They had no right to do so for the first time in summary judgment, and even there, the evidence is undisputed that Ms. McDonald had no knowledge of why Colwell Banker was selected and didn't care so that she can't establish those facts. Roberts. I think your arguments are well-developed and you're brief. Thank you very much. Thank you. Mr. Terbeek, you have one minute. Thank you, Your Honors. Just briefly on the numbers so we can get them correct, and I apologize for not being as prepared as I should have been on this one, without the $4,500 carryback against the sales price, if it was accredited against the paper, the net to the seller at close would have been $138,501, which is $500 more than he actually got. Otherwise, it would have been $134,001, which is just a little bit less than what he actually got, but then he would have had this note that he could have foreclosed on if she didn't pay it against the property. Well, counsel, there is a direct contradiction between what you heard counsel say and what I think you're saying in terms of the quote, the no paper issue. That's a factual dispute. That's we have the testimony from the seller. Understand from the record, it's very clear that the very first time the seller ever saw the written offer was when I showed it to him at deposition, and I had a difficult time getting it in front of him at deposition. That was the very first time he saw it. When he considered it, thought it was a strong offer, probably would have taken it because it gave him more money. Well, now, what is your response to the position Ms. Menard makes that the offer was in fact communicated and that the no paper was in fact communicated back to your client? The record is in dispute on I think that, and I think it's very clear, though, that the offer was withdrawn. That's the thing. The offer was withdrawn by the buyer's own agents who had a fiduciary duty to do everything they could to advance the matter, and that's in dispute. There was no attempt to resurrect it by Gallagher or Mattioli. There's a factual, so I have it clear in my own mind, there's a factual dispute about the discussions between McDonald and or Coleman and Gallagher slash Mattioli as to whether the offer was to be withdrawn or countered or whatever. Exactly. Is that what you're saying? Exactly. All right. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. One, three, two, all persons having had this hearing on the United States Court of Appeals of the Ninth Circuit will now depart. This Court, for this session, now stands adjourned. Thank you.
judges: O'scannlain, Hawkins, Selna